**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOHN DOE, ) | Civil Action No.: |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | **COMPLAINT AND DEMAND** |
| ) | **FOR JURY TRIAL** |
| KINAN K. HREIB, M.D., STEPHEN ) | |
| E. SOUTHARD, M.D. and LAHEY ) | |
| CLINIC, INC. d/b/a LAHEY ) | |
| HOSPITAL & MEDICAL CENTER, ) | |
| ) | |
| Defendants ) | |
| ) | |

## SUMMARY OF THE CASE

1. This complaint asserts claims for medical malpractice against two physicians and the Lahey Clinic, Inc. d/b/a Lahey Hospital and Medical Center, for failure to properly and timely diagnose the Plaintiff's HIV infection resulting in the spread of the infection and permanent physical and mental damage. At the time of these events, the Plaintiff was an aspiring law student with a brilliant future who subsequently began working with the probate court in Massachusetts as a licensed attorney. As a result of the combined negligence of the Defendants, the Plaintiff has lost his career and suffered permanent damage to his health.

## PARTIES

2. The Plaintiff, John Doe, is an adult who currently resides at 96 Pitt Street, New York, Manhattan County (New York County), New York 10002.

3. The Defendant, Kinan K. Hreib, M.D. ("Dr. Hreib"), was at all times relevant to this complaint a physician licensed to practice medicine in the Commonwealth of Massachusetts with a business address located at Lahey Clinic, 41 Mall Road, Burlington, Middlesex County, Massachusetts 01805.

4. The Defendant, Stephen E. Southard, M.D. ("Dr. Southard"), was at all times relevant to this complaint a physician licensed to practice medicine in the Commonwealth of Massachusetts with a business address located at Lahey Clinic, 41 Mall Road, Burlington, Middlesex County, Massachusetts 01805.

5.   The Defendant, Lahey Clinic, Inc. d/b/a Lahey Hospital and Medical Center ("Lahey Clinic)", was at all times a duly authorized Corporation in the Commonwealth of Massachusetts with a business address at 41 Mall Road, Burlington, Middlesex County, Massachusetts 01805.

## JURISDICTION

6.   The Defendants at all relevant times were engaged in the practice of medicine in Massachusetts and are subject to the personal jurisdiction of this Court

7.   The District Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 since there is complete diversity of citizenship between the Plaintiff and each Defendant and the amount in controversy exceeds $75,000.00.   Venue is proper in the District Court pursuant to 28 U.S.C. § 1391 since the Defendants are Massachusetts residents and a Massachusetts entity with their principle place of business in Burlington, Massachusetts and/or were physicians practicing medicine in Massachusetts at all relevant times.

## THE FACTS

8.   The Plaintiff was a patient at Lahey Clinic in Burlington and was treated between 1996 and 2010 by various physicians, including the Defendants. On or about November 14, 2006, John Doe, who was 36 years old, was seen by the Department of Psychiatry at Lahey Clinic. At that time he was evaluated by a licensed clinical social worker, Elizabeth Downs ("Ms. Downs"). A note in the medical record by Ms. Downs indicates the following:

> "Mr. Doe has been feeling overwhelmed, depressed and having trouble focusing… he is in his third year of law school, attending at night… he is in the top third of his law school class and on the Law Journal… he is a 'somewhat closeted' gay man who is not really out to his family."

9.   On or about the same date, Mr. Doe was also evaluated by Martha Koutsos M.D. ("Dr. Koutsos"), a psychiatrist at Lahey Clinic. Dr. Koutsos indicated that Mr. Doe was suffering from some stress due to sexuality issues and that he is quite lonely due to his sexual orientation. Dr. Koutsos' assessment was major depression, mild to moderate, recurrent.

10.   On or about November 25, 2006, Mr. Doe reported to the Urgent Care Department at Lahey Clinic where he was evaluated by Claire Gibson, PA-C. At that time Mr. Doe reported concerns regarding a canker sore in his oral cavity following some sexual activity and that he wanted to be tested for syphilis. Ms. Gibson noted that Mr. Doe had a

"small canker type sore at the base of his inner lower lip without any significant surrounding erythema. There is nothing that looks like herpes. We briefly discussed STD prevention..."

11. On or about February 12, 2007, Mr. Doe saw his primary care physician at Lahey Clinic, Stephen Southard, M.D.

12. On or about May 7, 2007, Mr. Doe was again seen by Dr. Southard. At that time, Dr. Southard reported that for the past two weeks Mr. Doe had a febrile illness with some malaise joint stiffness and aches and a scattered maculopapular rash over the trunk and extremities. Suspecting the possibility of a viral infection, Dr. Southard noted that he will check Epstein-Barr viral antibodies, Cytomegalo and Parvovirus.

13. On or about May 10, 2007, Mr. Doe reported to the Emergency Department at Lahey Clinic. At that time his chief complaint as noted in the medical records was numbness and inability to shut his left eye. Additionally, he was noted to have a facial droop. During that visit Mr. Doe was diagnosed as having Bell's Palsy and he was instructed to call Dr. Southard on Monday or Tuesday for the results of the lab tests including a Lyme test that they had ordered for him and a progress report to explain his symptoms. In addition, he was instructed to tape his eye shut at bedtime. There was no etiology provided to Mr. Doe for his symptoms.

14. On or about May 22, 2007, Mr. Doe was again seen in the Emergency Department at Lahey Clinic. At that time his chief complaint was weakness with new right facial droop and dysarthria that had been present for two days with weakness and difficulty with speech. His deficits were described as moderate. During that visit the admitting diagnosis was cranial neuropathy of uncertain etiology.

15. On May 22, 2007, Mr. Doe was admitted to the neurology service at Lahey Clinic. He was seen by Dr. Hreib, a Lahey Clinic neurologist, who performed a physical examination of Mr. Doe. According to the medical notes of Dr. Hreib, he was aware Mr. Doe had been seen at Lahey Clinic Emergency Department in early April for flulike symptoms, given antibiotics and sent home. The note also indicates that the patient had been told that he had a viral illness and was sent home on his Z-pack. Dr. Hreib noted that the patient reported having muscle, ankle and hand and joint pain and stiffness; a strep test was negative. Dr. Hreib also documented that Mr. Doe's symptoms persisted and on or about May 10, 2007 he presented to the emergency room with complaints of left facial droop and difficulties with speech. He indicated that the patient had been diagnosed with Bell's palsy and sent home. Additionally, Dr. Hreib indicated the patient did not improve. At all relevant times, Dr. Hreib had access to Mr. Doe's medical records at Lahey indicating he was a gay man and that he worked as a paramedic thereby increasing the likelihood of exposure to an HIV infection.

16. After an examination by Dr. Hreib, his assessment and recommendations were that the patient presented with what appears to be a viral illness over the past several weeks with

       initial unilateral facial weakness and now bilateral facial weakness of unknown etiology. Dr. Hreib noted "There is no risk of HIV, but testing will be considered, an isolated/limited form of Guillain-Barre syndrome." Dr. Hreib also indicated that the workup should include a brain MRI with contrast.

17. On or about May 22, 2007, Mr. Doe was asked to and did sign a consent form for the Human Immunodeficiency Virus (HIV) laboratory test, which was witnessed by his sister, Kristen Robishaw. Although Dr. Hreib recorded "There is no risk of HIV", but testing will be conducted, Mr. Doe had been informed by other medical personnel that his symptoms were highly suggestive of HIV infection.

18. On or about May 24, 2007, Dr. Hreib wrote a discharge summary for Mr. Doe indicating that he had a strep test, which was negative, that his liver function tests were noted to be elevated, that Mr. Doe had persisted with his symptoms and on May 10, 2007 presented to the emergency room complaining of left facial droop without sinus drainage or ear pain and that he had been diagnosed with Bell's Palsy and sent home and that two days after had developed left facial weakness. Dr. Hreib also indicated that the MRI results and the lumbar puncture for spinal fluid analysis were unremarkable, however, the patient continued with persistent bifacial weakness and at the time of the note the test for the spinal fluid was still pending. At the time of discharge, Mr. Doe was discharged by Dr. Hreib on additional doses of acyclovir and prednisone and to be followed by his primary care physician, Dr. Southard. No reasons were given to Mr. Doe to explain his symptoms.

19. On or about June 8, 2007, Mr. Doe was seen by Dr. Southard in the General Internal Medicine Department at Lahey Clinic. Mr. Doe had been out of work since May 10, 2007 and planned to go back on June 13, 2007. During this visit, Mr. Doe was informed that all his tests looked good. Based on these representations, Mr. Doe believed that this included the HIV testing recommended by Dr. Hreib and for which he had signed a consent form. Mr. Doe had requested a note for disability and to return to work from Dr. Southard. Dr. Southard wrote the note indicating that the patient was improving from his Bell's Palsy and advised him that he should recheck a Lyme titer to be sure nothing was turning positive and that they would get a C-Reactive Protein test (CRP). A CRP test is used to detect inflammation if there is a high suspicion of a tissue injury or infection somewhere in the body. Mr. Doe did not hear anything further regarding the HIV testing or any other testing.

20. On or about June 11, 2007, Mr. Doe was seen by Dr. Hreib. Although there was some improvement in his bilateral facial weakness, Dr. Hreib recorded that they were not able to find any specific explanation for Mr. Doe's symptoms or any etiology. Dr. Hreib indicated he did not need to see the patient again. Mr. Doe continued to be seen for various reasons at Lahey Clinic including folliculitis (10/31/07) and ureteritis (05/29/08).

21. After his visits with the various physicians as indicated above, Mr. Doe was advised that all of his neurological tests and lab results were negative. At that time Mr. Doe believed that an HIV test had been performed based on the consent form that he had signed and

that the HIV test was negative as well. As of this time period, no medical care provider ever advised Mr. Doe that the HIV test he consented to was never performed. At all relevant times HIV infected persons often manifested co-existing conditions such as neurological deficits, folliculitis, diarrhea and elevated uric acid levels similar to Mr. Doe's symptoms.

22. On or about May 29, 2008, Mr. Doe was seen by Dr. Thomas Bilodeau in the General Internal Medicine Department at Lahey Clinic. At that time Dr. Bilodeau indicated that Mr. Doe came in for a burning sensation in his urine for a couple of days. Dr. Bilodeau assessed Mr. Doe's problem as ureteritis and that he would treat Mr. Doe empirically with doxycycline.

23. On or about October 15, 2008, Mr. Doe was seen at Lahey Clinic complaining of unexplained left ankle pain without injury. Lab work revealed high uric acid and a diagnosis of gout. On October 21, 2008 he had unexplained diarrhea. He was seen again on November 3, 2008 and diagnosed with inflammatory arthritis of his ankle and high uric acid count. His complaints of ankle pain continued on December 16, 2008 and February 5, 2009 when he was found to have abnormal blood lab levels.

24. On or about April 30, 2009, Mr. Doe complained about an infection and irritation around his umbilicus, which was diagnosed as omphalitis, and constipation for several months. The records indicate he was worried it might be an indication of a medical problem and asked for a complete workup. Blood tests were ordered but no HIV testing was performed. Thereafter, he continued to treat for recurrent omphalitis.

25. On or about December 4, 2009, Mr. Doe was diagnosed with Herpes Zoster (shingles) and residual neuritis and it is recorded that he had a prior episode of thoracic shingles.

26. On or about December 28, 2009, Mr. Doe is seen at Lahey Clinic for abnormal gait of two month duration, has become forgetful and has poor concentration and generalized confusion.

27. On or about January 5, 2010, Mr. Doe returned to Dr. Hreib in the Neurology Department at Lahey Clinic. At that time Dr. Hreib notes that he is seeing Mr. Doe in consultation at the request of Dr. Southard for evaluation of weakness, unsteadiness, memory difficulties and difficulties in concentration. Dr. Hreib's notes indicate that approximately a year ago Mr. Doe began experiencing difficulties in concentration and memory and that his walking began to deteriorate about six weeks after he developed zoster. His note also indicates that he cannot keep track of his cases that he reviews, that he is forgetful and that sometimes he shows up for work when he is not supposed to. Additionally, the patient is noted to have difficulties coming up with the correct names or words and that despite a high-fat diet, he has lost a significant amount of weight, has developed constipation, urinary difficulties, decreased appetite and occasional headaches.

28. In his assessment Dr. Hreib indicates that Mr. Doe presented with a constellation of

symptoms and difficulties. The only abnormality noted on the recent testing was a low B12 level for which Dr. Hreib indicated he will pursue additional workup. Dr. Hreib recommended a brain image and cervical spine image with an MRI.

29. On or about January 28, 2010, Mr. Doe saw Dr. Hreib and they reviewed the test results. Since Dr. Hreib had no explanation for the symptom on this visit, Dr. Hreib spoke with Mr. Doe about the referral to Hematology/Oncology to rule out multiple sclerosis.

30. On or about January 29, 2010, Mr. Doe was seen in the Hematology/Oncology Department at Lahey Clinic. Dr. David Steinberg noted that Mr. Doe was homosexual and suggested that in addition to other tests Mr. Doe should have a test for HIV. Mr. Doe advised the physicians caring for him that he had been previously tested for HIV in 2007 and that the test was negative. However, the doctors recommended that he be retested and Mr. Doe agreed and consented to an additional HIV test.

31. After the testing, which occurred on or about January 29, 2010, Mr. Doe was informed that he was HIV-positive. This was the first time he became aware he was HIV positive. He was shocked to learn about his positive test results since he had been advised earlier that his HIV testing was negative.

32. On or about March 2, 2010, Dr. Hreib wrote a letter on behalf of Mr. Doe indicating that Mr. Doe had been seen at the Lahey Clinic for progressive cognitive decline and gait difficulties. Dr. Hreib also indicates that Mr. Doe had been ultimately diagnosed as having HIV, which he believed is the root cause of his neurological problems as well as his other systemic complaints. Dr. Hreib indicated that Mr. Doe is undergoing treatments at that time but had not shown any progress.

33. At all relevant times the Plaintiff was employed as a paramedic. In this role he was frequently exposed to patients with HIV infections and infected body fluids, including blood and medical instruments thereby increasing his likelihood of HIV exposure. The Defendants were aware of the Plaintiff's employment as a paramedic and the risks of exposure to HIV infected persons.

34. Mr. Doe discontinued his care with the Lahey Clinic. Mr. Doe obtained a copy of his medical records from Lahey Clinic and did not find any record indicating that the HIV test he was advised to have done and to which he consented had ever been performed. On or about October 5, 2010, Mr. Doe began treatment with Dr. Joseph Baker, an HIV specialist, at the Fenway Health Center. Dr. Baker subsequently informed Mr. Doe that according to his review of Lahey Clinic's medical records there had not been any HIV testing performed prior to the test in January, 2010. At that time, Mr. Doe's HIV infection was quite severe and had existed for some time allowing the infection to progress, further compromising Mr. Doe's immune system and causing permanent damage to him. Mr. Doe began a treatment plan for HIV infection with some improvement, however, he is left with permanent damage to his physical and mental health and he will continue to incur medical expenses related to his care. He has also

suffered a loss of career and loss of earning capacity.

## COUNT I
## NEGLIGENCE AGAINST THE DEFENDANT,
## KINAN K. HREIB, M.D.

35. The Plaintiff repeats and restates the allegations contained in paragraphs 1 through 34 and incorporate said allegations herein by reference.

36. At all relevant times the Defendant, Kinan K. Hreib, M.D., held himself out to the general public as a medical provider capable of providing appropriate medical care and treatment to patients and accepted John Doe as a patient.

37. As a direct and proximate result of the negligence of the Defendant, Kinan K. Hreib, M.D., John Doe was caused to suffer pain, suffering and emotional distress, incurred medical expenses past and present, and has suffered and will continue to suffer loss of earning capacity as a result of Dr. Hreib's negligence during the course of his care and treatment from 2007 to the present.

   WHEREFORE, the Plaintiff, John Doe, demands judgment against the Defendant, Kinan K. Hreib, M.D., in an amount that this Honorable Court shall deem just and proper, together with interest and costs.

## COUNT II
## NEGLIGENCE AGAINST THE DEFENDANT,
## STEPHEN E. SOUTHARD, M.D.

38. The Plaintiff repeats and restates the allegations contained in paragraphs 1 through 37 and incorporate said allegations herein by reference.

39. At all relevant times the Defendant, Stephen E. Southard, M.D., held himself out to the general public as a medical provider capable of providing appropriate medical care and treatment to patients and accepted John Doe as a patient.

40. As a direct and proximate result of the negligence of the Defendant, Stephen E. Southard, M.D., John Doe was caused to suffer pain, suffering and emotional distress, incurred medical expenses past and future, and has suffered and will continue to suffer loss of earning capacity as a result of Dr. Southard's negligence during the course of his care and treatment from 2007 to the present.

   WHEREFORE, the Plaintiff, John Doe, demands judgment against the Defendant, Stephen E. Southard, M.D., in an amount that this Honorable Court shall deem just and proper, together with interest and costs.

# COUNT III
# NEGLIGENCE AGAINST THE DEFENDANT, LAHEY CLINIC, INC. d/b/a LAHEY HOSPITAL & MEDICAL CENTER

41. The Plaintiff repeats and restates the allegations contained in paragraphs 1 through 40 and incorporate said allegations herein by reference.

42. At all relevant times the Defendant, Lahey Clinic, Inc. d/b/a Lahey Hospital and Medical Center, held itself out to the general public as a hospital capable of providing appropriate medical care and treatment to patients and accepted John Doe as a patient.

43. As a direct and proximate result of the negligence of the Defendant, Lahey Clinic, Inc. d/b/a Lahey Hospital and Medical Center, John Doe was caused to suffer pain, suffering and emotional distress, incurred medical expenses past and future, and has suffered and will continue to suffer loss of earning capacity as a result of Lahey Clinic, Inc. d/b/a Lahey Hospital and Medical Center's negligence during the course of his care and treatment from 2007 to the present.

WHEREFORE, the Plaintiff, John Doe, demands judgment against the Defendant, Lahey Clinic, Inc. d/b/a Lahey Hospital and Medical Center, in an amount that this Honorable Court shall deem just and proper, together with interest and costs.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS.**

Respectfully Submitted,
The Plaintiff,
By His Attorney,

 */s/ David P. Angueira*
David P. Angueira, Esq.
BBO No.: 019610
Swartz & Swartz, P.C.
10 Marshall Street
Boston, MA 01208
(617) 742-1900

Dated: January 17, 2013